# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

PHYLLIS KENNEDY,                    :

          Plaintiff,         :

                     Case No. 3:08cv00144

  vs.                              :

                     District Judge Thomas M. Rose

MICHAEL J. ASTRUE,                  :   Magistrate Judge Sharon L. Ovington
      Commissioner of the Social
      Security Administration,       :

          Defendant.       :

---

## REPORT AND RECOMMENDATIONS[1]

---

## I.      INTRODUCTION

Plaintiff Phyllis Kennedy injured her neck in a motor vehicle accident in 1988,

resulting in a fusion of her C6-T1 vertebrae performed by James T. Lehrner, M.D.  (Tr.

237).  Since an aggravation of her neck problems in 2001, she has suffered from various

medical complaints, including cervical strain with radiculopathy, cervical spondylosis,

degenerative disc disease, chronic pain, and numbness in her hands.  (Tr. 176).  Her

medical problems prevent her from performing her past work as a licensed practical nurse

or as a bartender.  (Tr. 205-12).  She consequently sought financial assistance from the

Social Security Administration by applying for Disability Insurance Benefits ["DIB"],

---

[1] Attached hereto is NOTICE to the parties regarding objections to this Report and Recommendations.

asserting that as of February 16, 2001, she was under a "disability" within the meaning of the Social Security Act. (Tr. 156-59).

During a first round of proceedings, Plaintiff's DIB application was denied at each stage of administrative review. The most significant denial came in a March 31, 2004 decision by Administration Law Judge ["ALJ"] Daniel R. Shell, who concluded that Plaintiff was not under a "disability" as defined by the Social Security Act and consequently was not eligible to receive DIB. (Tr. 18-32).

Plaintiff challenged ALJ Shell's initial denial decision by filing a case in this Court. *See Kennedy v. Barnhart*, No. 3:05CV415 (S.D. Ohio March 12, 2007) (Ovington, M.J.). In March 2007, the Court remanded the case to the Commissioner under Sentence Four of 42 U.S.C. §405(g) for further proceedings. *See id.* (Tr. 416-36).

On remand and after receiving additional evidence, ALJ Shell held a second hearing (Tr. 609-53), and later issued his second written decision denying Plaintiff's DIB application on the ground that she was not under a disability. (Tr. 395-413). ALJ Shell's second decision later became the final determination of the Commissioner of the Social Security Administration. Such final determinations are subject to judicial review, *see* 42 U.S.C. §405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Specific Errors (Doc. #7), the Commissioner's Memorandum in Opposition (Doc. #8), the administrative record, and the record as a whole. Plaintiff seeks a reversal of ALJ Shell's second decision and a judicial award of DIB, or at a minimum, a remand of this case to the Social

Security Administration to correct certain alleged errors.  The Commissioner seeks an Order affirming ALJ Shell's second decision.

## II.    ADDITIONAL BACKGROUND

### A.    <u>Treating Medical Sources</u>

<u>2001</u>

In February 2001, while assisting a patient in her job as a licensed practical nurse, Plaintiff re-injured her neck.  (Tr. 237, 332).  She was treated by Steven Gamm, M.D., at MedWork, from February 2001 through May 2002.  (Tr. 254-345).

An MRI of Plaintiff's cervical spine in April 2001 showed the presence of hardware from her previous fusion surgery, as well as mild disc bulging at the C2-3 and C3-4 levels with associated osteophyte formation.  At the C3-4 level, the bulging produced mild to moderate central canal stenosis.  Facet arthropathy and posterior vertebral osteophyte formation at this level produced marked neural foraminal encroachment on the right and mild such encroachment on the left.  (Tr. 339-40).

On May 25, 2001, Dr. Gamm noted a diagnostic impression of cervical strain with radiculopathy and aggravation of cervical spondylosis.  (Tr. 295).  He limited Plaintiff to working four hours per day up to a maximum of 12 hours per week.  (Tr. 295).

In July 2001, Dr. Gamm completed a form indicating that he believed Plaintiff to be limited to four hours of work per day up to 12 hours per week.  (Tr. 343).  He noted that Plaintiff could not climb ladders or engage in strenuous activity, and could lift a maximum of 10 pounds.  *Id*.  On this form, Dr. Gamm check a box indicating that

Plaintiff's condition was "temporary." *Id*.

On October 9, 2001, Dr. Gamm completed a form opining that Plaintiff could work four hours per day up to 12 hours per week; lift 10 pounds occasionally and five pounds frequently; bend and reach occasionally; never crawl or climb; sit for four hours in a workday; and stand or walk for two hours each during a four hour workday. (Tr. 344).

At some point after examining Plaintiff on December 21, 2001, Dr. Gamm completed another form on which he checked a box indicating that Plaintiff's restrictions are "permanent." (Tr. 342). Dr. Gamm noted that Plaintiff was restricted to four hours of work per day up to 12 hours per week, with "no strenuous activity." (Tr. 342).

## 2002

A cervical CT performed on January 9, 2002, revealed moderate to severe right neuroforaminal narrowing and mild to moderate left neuroforaminal narrowing at C3-4. (Tr. 335). This CT further revealed additional degenerative changes in Plaintiff's cervical spine, such as a diffuse disc bulge/protrusion at the C3-4, C4-5, C5-6 levels. *Id.*

In March 2002, Dr. Demirjian, a neurologist, examined Plaintiff on referral from Dr. Gamm. Dr. Demirjian noted that Plaintiff had a few trigger points in her neck and lumbar regions. (Tr. 245). He further wrote, "The patient has undergone a complete type of treatment and has seen several physicians including pain management with trigger points, physical therapy, chiropractic care, and a variety of medications including anti-inflammatories and muscle relaxants." (Tr. 245). Dr. Demirjian continued, "The

4

recommendation at this point is the possibility for a four-week pain rehabilitation program. I see no other options at this point. The pain program would be an interdisciplinary approach in which physical and occupational therapy and psych [sic] would all be combined to gradually increase the strength and endurance and insure proper body mechanics . . . " (Tr. 245).

Plaintiff began treatment in a pain rehabilitation program in April 2002. (Tr. 246-53). A discharge report written in May 2002 indicated that she did not complete the program (Tr. 246-47), citing "[e]arly discharge due to [Plaintiff's] feeling that she had increased symptoms and that she felt that alternative medicine would be much more beneficial, and her ideas in regards to that would be chiropractor and acupuncture." (Tr. 247). In an earlier report from that program, a therapist noted that Plaintiff "really does not want to work." (Tr. 249). Plaintiff walked 660 feet without difficultly, stood for 13 minutes with constant shifting, and sat for 31 and 41 minutes. Although Plaintiff demonstrated "significantly decreased" strength in her shoulders, trunk and lower legs, the therapist noted that if Plaintiff really were as weak as she claimed, she would be unable to sit up or walk. (Tr. 249).

In April 2002, Plaintiff's treating orthopedic surgeon, Dr. Lehner, noted that despite Plaintiff's reported symptoms in December 2001, his examination was "fairly benign." (Tr. 238). He explained that an MRI revealed that "[t]he fusion that we did from C6-T1 has incorporated C5 also into that fusion mass. There are some degenerative changes with bulging of the C3-4 and C4-5 disc with some irregularity at those levels

with some arthritis.  There bulges are very minimal[,] though, and they do not encroach on the cord."  (Tr. 238).  Dr. Lehner told Plaintiff that he "didn't see anything . . . that looked to be a surgical problem."  *Id*.  He further wrote, in part:

> I just think this is a tough situation for her, and I don't know how to get it better.  Therapy hasn't really helped with this.  I think there are degenerative changes in the cervical spine that can be giving her some symptoms, but usually people can learn to live with these pretty well.
>
> As far as whether I see these kind of symptoms and persistence of symptoms in association with the degree of physical findings described, I would say that I do not usually.  I can't explain why.  I have gotten all the tests I can get on this.  I can't explain why this is bothering her as much as it is . . .
> There is no motor loss.
>
> There is no limited motion, except for the lower cervical spine which has a fusion . . .
>
> I did not notice any inability to do fine or gross manipulation.
>
> I think her gait was pretty much normal . . .

(Tr. 239).

In November 2002, Plaintiff overdosed on medication and alcohol and was taken to a hospital.  (Tr. 569-85).  The discharge summary from that hospitalization noted that Plaintiff "was heavily into somatization and she refused to take psychiatric medication."  (Tr. 569).  Plaintiff denied depression, anxiety or suicidal thoughts, and declined to participate in any substance abuse program or treatment.  (Tr. 569-70).

**2003 – 2007**

In January 2003, Plaintiff's treating osteophath, Gary Dunlap, D.O.,[2] opined that Plaintiff could lift 10 pounds occasionally and five pounds frequently; could stand or walk three hours in a workday, no more than 30 minutes at a time; could sit for three hours in a workday, no more than 30 minutes at a time; and could never climb, balance, kneel or crawl. (Tr. 377-39). Dr. Dunlap concluded that Plaintiff could not perform even sedentary exertional work. (Tr. 380A). Dr. Dunlap based his opinion on Plaintiff's reduced spinal range of motion in all areas, associated muscle spasm, and neuritis in the arms with activity including numbness and muscle weakness and pain. (Tr. 377-380A).

In January 2004, Dr. Dunlap reported that Plaintiff could work only four hours, every other day, because if she worked more, she "ends up in bed with stiffness and increased pain." Although Plaintiff worked as a bartender, Dr. Dunlap thought this was possible because "her bartending is during off hours with a light workload." (Tr. 381).

On June 8, 2007, Plaintiff underwent MRIs of the cervical, thoracic and lumbar spine. The cervical spine MRI showed multilevel disc disease secondary to disc osteophyte complex, most pronounced at C3-C4 and C4-C5. No central canal stenosis was noted. At C4-C5, moderate right and mild left foraminal stenosis was noted. The thoracic spine MRI showed mild degenerative changes throughout. The lumbar spine MRI revealed multilevel multi factorial disc disease, most pronounced at the L4-L5 and L5-S1 levels. There were broad-based disc bulges at both these levels with mild central

---

[2] Plaintiff treated with Dr. Dunlap from May 2002 through May 2007. (Tr. 371-76, 484-89, 532-36, 601). The treatment consisted of acupressure, osteopathic manipulation therapy and medication.

canal stenosis, along with moderate right and mild left foraminal stenosis with associated facet and ligamentous hypertrophy. (Tr. 517-31, 587-89, 602-06).

In September 2007, Dr. Dunlap reported that Plaintiff had diminished range of motion and muscle spasm in the spine. He concluded that she suffered from degenerative disc disease at multiple levels with moderate foraminal stenosis on the right of C3-4 and C4-5 and in the lumbar area at L4-5 and L5-S1, along with post-laminectomy and fusion of C6-T1. He reported, "Prognosis is poor in this patient as her symptoms have progressed and she is showing another area of moderate foraminal stenosis at C4-5." (Tr. 594-595).

### B, <u>Non-Treating Medical Sources</u>

The record also contains the opinions of several non-treating medical professionals. Judith A. O'Connell, D.O., examined Plaintiff on January 21, 2004 and reviewed her medical records. (Tr. 382-91). Her examination revealed that Plaintiff had extremely limited range of spinal motion and could not heel or toe walk. (Tr. 388). Dr. O'Connell noted no radiation into Plaintiff's arms or legs, and that her reflexes and sensation were intact, she had negative straight leg raising, and she had near normal strength in her arms and legs. *Id.* She also had no muscle spasms. *Id.* Dr. O'Connell reported that an EMG was negative and that an MRI scan of the lumbar spine revealed only mild abnormality. *Id.*

Dr. O'Connell concluded that based on history, physical examination and review of the medical records, Plaintiff suffered from cervical and lumbar spondylosis with

degenerative disc disease. (Tr. 391). Dr. O'Connell noted that Plaintiff had undergone multiple modalities of treatment and had not responded favorably to any of these interventions. She noted in particular that Plaintiff's "treating physician Dr. Gamm placed her on restrictions that have not been lifted since 5-21-01." *Id.* Dr. O'Connell believed that Plaintiff's prognosis was "poor." (Tr. 391). She further opined that the combination of Plaintiff's impairments precluded her from performing "substantial gainful employment on more than a part-time basis." *Id.*

Relying on her explanations in her report, Dr. O'Connell also completed a medical assessment form stating her opinion that Plaintiff was (1) unable to perform sedentary, light, or medium exertional work activities; (2) unable to stand or walk more than three hours or 15 minutes at a time; (3) unable to sit more than three hours total during a workday or more than 15 minutes at a time; and (4) unable to work at heights, around machinery, in temperature extremes, around vibrations, or in humidity. (Tr. 382-86).

In June 2007, Plaintiff was examined by a state agency physician William O. Smith, M.D. (Tr. 490-504). Dr. Smith's examination revealed decreased range of motion in Plaintiff's cervical and lumbar spine. She had 5/5 strength in all muscle groups in her arms; normal grasp, manipulation, pinch, and fine coordination; voluntary weakness in her hand grip; and normal reflexes. Testing in Plaintiff's legs was unreliable due to give away weakness. Dr. Smith reported that Plaintiff "displayed weakness in her feet when on the examining table; yet when she walked across the floor there was no evidence of weakness." (Tr. 491). Plaintiff was able to "raise up on her toes and heels without

difficulty," *id.*, and sensation in both legs was normal. Dr. Smith diagnosed Plaintiff with multi-level cervical spondylosis, lumbar spondylosis, degenerative disc disease thoracic at T3-4 and T4-5, residual fracture dislocation at C7, and hepatitis C. (Tr. 492).

Dr. Smith concluded that Plaintiff had "restriction in motion of her cervical and lumbar spine but very little objective neurologic deficit and some evidence of symptom magnification." (Tr. 492-93). Dr. Smith found "very little objective evidence on her exam that she has much impairment." *Id.* He opined that Plaintiff might have impairment of lifting and carrying objects but had no impairment sitting, walking, handling objects, hearing, speaking or traveling. *Id.* He further opined Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; she could sit and stand for a total of one hour each during a workday, for only 15 minutes at a time; and she could walk a total of one hour during a workday, for 20 minutes at a time. (Tr. 498-99).

In January 2008, Henry Maimon, M.D., reviewed Plaintiff's medical records and answered a small number of written interrogatories. (Tr. 607-08). The ALJ explained that Dr. Maimon was consulted in "[i]n order to better evaluate the effects of hepatitis C . . ." (Tr. 402). Dr. Maimon determined that the most appropriate Listing was 5.05, which addresses the criteria necessary to establish the existence of a disability based on chronic liver disease.[3] (Tr. 608). Without elaborating, Dr. Maimon opined that Plaintiff did not meet or equal the level of severity described in Listing 5.05. (Tr. 607-08).

---

[3] The Commissioner's Listing of Impairments is found at 20 C.F.R. Part 404, Subpart P, Appendix 1.

During the ALJ's second hearing, Arthur Lorber, M.D,. a board-certified orthopedic surgeon, testified as a medical expert. (Tr. 628-48). Dr. Lorber opined that Plaintiff did not have any impairments of listing level severity. (Tr. 636). Dr. Lorber believed that Plaintiff was limited to light work exertionally, with some postural and environmental limitations. *Id.* Dr. Lorber indicated that the state agency physician's opinion of medium work exceeded what would be expected after cervical fusion. (Tr. 638-39). Dr. Lorber also believed that the opinions of Drs. Gamm, Dunlap and O'Connell – particularly that Plaintiff could not perform even part-time work – "were too severe" and not supported by the record. (Tr. 639-41). Dr. Lorber explained that to support a finding of such limitations, he would like to see evidence of focal neurological deficit, similar to the findings required by Listing 1.04. (Tr. 647).

### C.     Plaintiff and Her Testimony

At the time of the ALJ's second decision, Plaintiff's age (50 years old) placed her in the category of "person closely approaching advanced age" for purposes of resolving her DIB application. *See* 20 C.F.R. §404.1563(d); *see also* Tr. 156, 613. Plaintiff graduated from high school, completed two years of college, and received additional training as sufficient to become a licensed practical nurse. (Tr. 182, 612).

Plaintiff testified during the ALJ's second hearing that she could not work as a nurse because the condition of her back precluded her from lifting. (Tr. 614). She explained that because "[m]y neck was wired and fused," *id*., she has only partial mobility in her neck. According to Plaintiff, a physician told her that she has spinal stenosis in her

lower back.  She also explained that her back problems preclude her from lifting or turning her head from side to side and further cause left leg numbness and her left leg to "go out" while walking or standing.  (Tr. 614-16).  She stated, "I go to put weight on it, and there's nothing there.  It's just like it goes to sleep all of a sudden."  (Tr. 615-16).

Plaintiff described the pain in her neck as "a shooting pain" which radiates down into her shoulders and hands, causing numbness in both hands.  (Tr. 618-19).  She also has chronic and nagging low back pain that gets "very sharp" and causes muscle spasms running down into both legs.  (Tr. 619).  These spasms generally occur a couple of times a week.  *Id.*

Plaintiff estimated she could sit for 15 to 20 minutes at a time, stand for 15 minutes, and walk one block.  (Tr. 622).  She testified that back pain prevents her from standing or walking further.  *Id.*

## III.    THE "DISABILITY" REQUIREMENT AND ADMINISTRATIVE REVIEW

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant (1) from performing his or her past job, and (2) from engaging in "substantial gainful activity" that is available in the regional or national economies. .  *See* 42 U.S.C. §423(d)(1)(A); *see also Bowen*,

476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

Social Security Regulations require ALJs to resolve a disability claim through a five-Step sequential evaluation of the evidence.  *See* Tr. 14-15; *see also* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any Step terminates the ALJ's review, *see also Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.      Has the claimant engaged in substantial gainful activity?

2.      Does the claimant suffer from one or more severe impairments?

3.      Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments (the Listings), 20 C.F.R. Subpart P, Appendix 1?

4.      Considering the claimant's residual functional capacity,[4] can the claimant  perform his or her past relevant work?

5.      Considering the claimant's age, education, past work experience, and residual functional capacity, can he or

_____

[4]  The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. §404.1545(a); *see Howard v. Commissioner of Social Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

13

she perform other work available in the national
economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6th Cir. 2001).

## IV.    ALJ SHELL'S SECOND DECISION

ALJ Shell determined at Step 1 that Plaintiff has not engaged in substantial gainful

activity since her claimed disability onset date of February 16, 2001.  (Tr. 406).

At Steps 2 and 3, the ALJ concluded that Plaintiff has the severe impairments of

spinal sprain/strain with underlying degenerative disc disease and hepatitis C, but that she

does not have an impairment or combination of impairments that meet or equal the level

of severity described in Appendix 1, Subpart P, Regulations No. 4.  *Id.*

At Step 4, the ALJ found that Plaintiff has the Residual Functional Capacity to

perform the basic exertional requirements of light work.[5]  (Tr. 407).  The ALJ limited

Plaintiff to no crawling; no balancing; no exposure to heavy vibration; no exposure to

hazardous machinery; no work at unprotected heights; and no climbing ladders, ropes or

scaffolding.  *Id.*  Plaintiff can climb ramps or stairs and should be permitted customary

breaks.  *Id.*  The ALJ further concluded at Step 4 that Plaintiff could not perform her past

relevant work.  (Tr. 411).

At Step 5, the ALJ determined that Plaintiff could perform a significant number of

---

[5]  The Regulations define light work as involving the ability to lift  "no more than 20 pounds at a
time with frequent lifting or carrying of objects weighing up to 10 pounds...."  20 C.F.R. §404.1567(b).

jobs in the regional and national economies.  (Tr. 412).  This assessment, along with the

ALJ's findings throughout his sequential evaluation, led him ultimately to conclude that

Plaintiff is not under a disability and hence not eligible to receive DIB.  (Tr. 395-413).

## V.    JUDICIAL REVIEW

Judicial review determines whether substantial evidence in the administrative

record supports the ALJ's factual findings.  *Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742,

745-46 (6th Cir. 2007).  "Substantial evidence is defined as 'such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion.'"  *Bowen*, 478 F.3d at

746 (citing in part *Richardson v. Perales*, 402 U.S. 389, 401 (1977)).  It consists of

"'more than a scintilla of evidence but less than a preponderance...'"  *Rogers v. Comm'r.*

*of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).

Judicial review for substantial evidence is deferential, not *de novo*.  *See Cruse v.*

*Comm'r of Soc. Sec.* 502 F.3d 532, 540 (6th Cir. 2007); *see also Cutlip v.*

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  An ALJ's

factual findings must be upheld "as long as they are supported by substantial evidence."

*Rogers*, 486 F.3d at 241 (citing *Her v. Comm'r. of Soc. Sec.*, 203 F.3d 388, 389-

90 (6th Cir. 1999)).  Once substantial supporting evidence is found in the administrative

record, courts do not consider whether they agree or disagree with the ALJ's findings or

whether the administrative record contains contrary evidence.  *Rogers*, 486 F.3d at 241;

*see Her*, 203 F.3d at 389-90.

Substantial evidence is not the analytical ending point.  Judicial review

further considers whether the ALJ "applied the correct legal criteria." *Bowen*, 478 F.3d at 746. If the ALJ does not, the decision may not be upheld even if the findings are supported by substantial evidence. *See id.* For example, a decision will not be upheld where the ALJ failed to apply mandatory procedural rules and standards established by the Commissioner's Regulations and where that failure prejudices a claimant on the merits or deprives the claimant of a substantial right. *See id.* (and cases cited therein).

## VI.   DISCUSSION

### A.   The Parties' Contentions

Plaintiff contends that the ALJ erred by giving controlling weight to the opinion of medical expert Dr. Lorber without discussing the required regulatory factors or providing any meaningful explanation of why the applicable factors led him to credit Dr. Lober's opinions. Plaintiff also contends that the ALJ similarly erred by rejecting the opinions of her treating physicians Drs. Gamm and Dunlap without proper analysis or without providing "good reasons" for rejecting their opinions. (Doc. #7).

The Commissioner maintains that substantial evidence supports the ALJ's residual functional capacity finding, emphasizing that the ALJ sought to comply with this Court's remand Order by obtaining and relying on Dr. Lorber's expert opinions. Additionally, the Commissioner argues that the ALJ properly evaluated the opinions of Plaintiff's treating physicians in accordance with the required regulatory framework and with *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

### B.   Medical Source Opinions

The treating physician rule, when applicable, requires ALJs to place controlling weight on a treating physician's opinion rather than favoring the opinion of a non-examining medical advisor, an examining physician who saw a claimant only once, or a medical advisor who testified before the ALJ. *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see Lashley v. Sec'y of Health & Human Servs.,* 708 F.2d 1048, 1054 (6th Cir. 1983); *see also* 20 C.F.R. §404.1527(d)(2), (e), (f). A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record. *Wilson*, 378 F.3d at 544; *see Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530 (6th Cir. 1997); *see also* 20 C.F.R. §404.1527(d)(2).

If a treating physician's opinion is not given controlling weight, then it must be weighed against other medical source opinions under a number of factors set forth in the Commissioner's Regulations – "namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source – in determining what weight to give the opinion." *Wilson*, 378 F.3d at 544 (citing 20 C.F.R. §404.1527(d)(2)).

More weight generally is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources. *See* 20 C.F.R. §404.1527(d)(1). However, the opinions of non-examining state agency medical consultants have some value, and under some circumstances, can be given significant

weight. This occurs because the Commissioner views nonexamining sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180 at *2. Consequently, opinions of one-time examining physicians and record-reviewing physicians are weighed under the same factors as those of treating physicians, including supportability, consistency, and specialization. *See* 20 C.F.R. §404.1572(d), (f); *see also* Ruling 96-6p, 1996 WL 374180 at *2-*3.

## C.   Analysis

The ALJ correctly recited the standards applicable under the treating physician rule to resolve whether a treating physician's opinion is due controlling weight. (*See* Tr. 404); *see also* 20 C.F.R. §404.1527(d)(2). The ALJ also applied these standards when evaluating the opinions of Plaintiff's treating physicians Drs. Gamm and Dunlap, concluding that their opinions were neither well supported by objective medical data nor consistent with other medical evidence of record. (*See* Tr. 404-05). In these respects, then, the ALJ did not err as a matter of law in declining to give those opinions controlling weight.

The ALJ was mistaken, however, in his failure to continue weighing the treating physicians' opinions under the remaining considerations described in the Regulations – namely, supportability, consistency, specialization, and "other factors, " as stated in 20 C.F.R. § 404.1527(d)(3)-(6) – in arriving at his conclusions regarding Plaintiff's residual functional capacity. The ALJ's decision neither describes the continued-weighing

requirement nor professes to apply the enumerated factors when explaining either the

ALJ's rejection of the opinions of Drs. Gamm and Dunlap (Tr. 404), or his apparent

adoption of the opinion of Dr. Lorber, regarding Plaintiff's residual functional capacity.

(*See* Tr. 408). By not describing or applying the correct legal criteria mandated by the

Regulations, the ALJ erred as a matter of law. Speaking through Social Security Ruling

96-2p, the Commissioner instructs:

> Adjudicators must remember that a finding that a treating
> source's medical opinion is not well-supported by medically
> acceptable clinical and laboratory techniques or is
> inconsistent with the other substantial evidence in the case
> record means only that the opinion is not entitled to
> 'controlling weight,' not that the opinion should be rejected.
> Treating source opinions are still entitled to deference and
> must be weighed using all of the factors provided in 20 C.F.R.
> §404.1527 and 416.927. In many cases, a treating source's
> medical opinion will be entitled to the greatest weight and
> should be adopted, even if it does not meet the test for
> controlling weight.

1996 WL 374188 at *4.

Similarly, the United States Court of Appeals for the Sixth Circuit has observed as

follows:

> When the treating physician's opinion is not controlling, the
> ALJ, in determining how much weight is appropriate, must
> consider a host of other factors, including the length,
> frequency, nature, and extent of the treatment relationship; the
> supportability and consistency of the physician's conclusions;
> the specialization of the physician; and any other relevant
> factors. However, in all cases there remains a presumption,
> albeit a rebuttable one, that the opinion of a treating physician
> is entitled to great deference, its non-controlling status
> notwithstanding.

*Rogers*, 486 F.3d at 242; *see Wilson*, 378 F.2d at 544.

While the ALJ does cite specific examples from the record as underlying his conclusion that Drs. Gamm's and Dunlap's opinions are not supported by objective medical findings and are inconsistent with other medical evidence of record (*see, e.g,* Tr. 238-39; 266-67; 371-76; 404-06; 484-504; 532-36, 601), nowhere does the ALJ analyze their opinions or that of the consulting medical expert, Dr. Lorber, subject to the Regulations' additional specified considerations such as the length, frequency, nature and extent of the treatment relationship, or the specialization of the medical source. (*See* Tr. 404-06). Although the ALJ did note that Dr. Lorber is a board-certified orthopedic surgeon (Tr. 402), for example, he did not explain how or why that specialty impacted his analysis of the credibility of Dr. Lorber's opinion relative to the credibility of the opinions of Plaintiff's own long-term treating physicians.

Given the ALJ's failure to apply the factors enumerated at 20 C.F.R. §404.1527(d) to the opinions of Plaintiff's treating physicians after declining to accord them controlling weight, or to the opinion of consulting physician Dr. Lorber on which the ALJ appears to have relied, Plaintiff's challenges to the ALJ's assessment of Plaintiffs' residual functional capacity have merit. Indeed, essentially the same error precipitated this Court's previous remand of Plaintiff's case to the ALJ in 2007, when we found that the ALJ's acceptance of another non-examining physician's residual functional capacity assessment of Plaintiff "d[id] not comply with the regulatory mandate" of 20 C.F.R. §§ 404.1527(d)(3)-(6) "because it did not explain why any of the applicable factors – such as

'supportability,' 'consistency,' and 'specialization' – led ALJ Shell to place dispositive weight" on that non-treating physician's opinion.  (Tr. 429).

This Court also cannot conclude that the ALJ's omission of the required analysis was harmless error.  *See Bowen*, 478 F.3d at 747-49. The error here consists of the ALJ's failure to adhere to established regulatory protections, which "[a] court cannot excuse . . . simply because . . . a different outcome on remand is unlikely."  *Wilson*, 378 F.3d at 546. The Court there continued:

> '[A] procedural error is not made harmless simply because the [aggrieved party] appears to have had little chance of success on the merits anyway.'  To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with §1527(d)(2), would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory.  The general administrative law rule, after all, is for a reviewing court, in addition to whatever substantive factual or legal review is appropriate, to 'set aside agency action . . . found to be . . . without observance of procedure required by law.'

*Id.* (internal citations omitted).

### D. <u>Award or Remand</u>

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence 4 of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of

law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In light of the finding that the ALJ made an error of law, remand of this matter to the Social Security Administration pursuant to Sentence 4 of § 405(g) is appropriate, to permit the ALJ to reassess Plaintiff's residual functional capacity. On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions of record under the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability and thus eligible for SSI. Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

**IT THEREFORE IS RECOMMENDED THAT:**

1.   The Commissioner's nondisability findings be vacated;

2.   No finding be made as to whether Plaintiff Phyllis Kennedy was under a "disability" within the meaning of the Social Security Act;

3.   This case be remanded to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.   The case be terminated on the docket of this Court.

July 15, 2009

                                                s/Sharon L. Ovington
                                                    Sharon L. Ovington
                                        United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within ten [10] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(e), this period is extended to thirteen [13] days (excluding intervening Saturdays, Sundays and legal holidays) because this Report is being served by mail. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within ten [10] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Am,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).